# EXHIBIT “1”

MLG
MAKKABI LAW GROUP
A PROFESSIONAL CORPORATION

9454 WILSHIRE BOULEVARD, SUITE 900
BEVERLY HILLS, CALIFORNIA 90212
TELEPHONE (310) 887-8000
FACSIMILE (310) 887-8001
INFO@MAKKABILAW.COM

March 26, 2024

***<u>CLEAR AND UNEQUIVOCAL TIME-LIMITED DEMAND: TIME SENSITIVE</u>***

*<u>Sent Via Facsimile:877-219-0742</u>*
*<u>Sent Via Email: maria.mendoza6@walmart.com</u>*
Walmart Claims
Attn: Maria Mendoza
PO Box 14731
Lexington, KY 40512

| | | |
|---|---|---|
| **RE:** | **Our Client :** | **Bradley Borges** |
| | **Your Insured :** | **Walmart** |
| | **Date of Loss :** | **12/9/2022** |
| | **Location of Loss:** | **Store 2609** |
| | **Claim No. :** | **10159112** |

Dear Maria Mendoza:

**Please forward this demand to all insurance decision makers and put all excess and reinsurers on notice of our client's demand. Furthermore, make sure to report to any and all excess and reinsurance carriers and forward this demand letter to all carriers up the tower.**

As you are aware, this office represents **Bradley Borges** with relation to the above-referenced claims for personal injuries against your insured,Walmart**.** The subject property where the incident took place was located at 2770 E Carson St, Lakewood, CA.

It is the rule in California that the keeper of a public place of business is bound to keep his premises and the passageways to and from it in a safe condition and must use ordinary care to avoid accidents or injury to those properly entering upon his premises on business. *Brown v. Holzwasser,* (1930) 108 Cal.App. 483, 487. This duty is not limited to conditions known to be dangerous but extends to those which might have been found dangerous by the exercise of reasonable care. *Raber v. Tumin,* (1951) 36 Cal.2d 654, 658.

Here, Walmart could have foreseen that any heavy machinery in motion—where there is heavy traffic and customers have no choice but to walk through the area to enter—could cause employees to risk not seeing handicapped patrons over the machinery and could result in injury to patrons. By making a reasonable investigation, taking thought, and exercising reasonable care, Walmart could have foreseen that any distracted employee moving merchandise at the store could impact a loyal patron.

It was Walmart's responsibility to ensure that its aisles were not a hazard to its customers. by its conduct described above, Walmart is subjected to negligence and liability to Bradley Borges for the injuries claimed in this matter. Walmart's negligence in not maintaining the store safe for patrons caused our client to be impacted by a mechanical cart while moving through the food aisle, and is the direct and proximate cause of his injuries.

Walmart did not conduct a reasonable inspection within a reasonable amount of time and failed to maintain its premises safe. This is evidenced by the fact that Walmart had many employees working in its store during the time the incident took place. Moreover, Walmart had cameras inside its store. The employee evidenced a distracted state of mind, which implies prior negligence. Yet, Walmart did not conduct a reasonable inspection. Had Walmart conducted a reasonable inspection, Walmart would have discovered the unsafe condition.

Factors considered by the court in determining the existence of a duty and defining its scope include:

1. Foreseeability of the specific harm suffered;
2. Severity of the injury;
3. Closeness of the connection between defendant's conduct and the injury suffered … especially the degree of control over the premises and the particular defect;
4. Moral blame attached to defendant's conduct;
5. Policy of preventing future harm;
6. Extent of the burden on defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach; and
7. Availability, cost and prevalence of insurance for the risk involved.

*See Rowland v. Christian*, supra, 69 C2d at 112-113, 70 CR at 100.

Regarding the first *Rowland* factor, Walmart could have **foreseen** that **negligence while operating heavy machinery could result in injury to patrons.** By making a reasonable investigation and exercising reasonable care,  could have foreseen that the food aisle is more prone to engagement, particularly during high customer traffic time and would create a dangerous condition.

Second, the **severity of injury** in this case is great as **Bradley Borges injured his neck, head, back, right side of his body, and incurred multiple disc protrusions in his cervical, thoracic, and lumbar spine**, which injuries led to multiple rounds of **epidural steroid injections, medial branch blocks, RFAs,** and may require additional surgical intervention.

As to the third *Rowland* factor, Walmart's negligent **conduct is closely connected** to **Bradley Borges**'s severe injuries. Walmart's failure to exercise reasonable care and keep its premises safe directly and proximately caused **Bradley Borges** to be impacted by a negligent employee.

Fourth, Walmart is directly and **morally** responsible for **Bradley Borges** 's severe injuries. There is nobody else that can be blamed for this tragic incident.

Fifth, a court will definitely find that there is a strong and compelling **public policy** to have your insured follow these safety rules of keeping their passageways in safe conditions to prevent future harm.

Sixth, the **benefit** to customers in having a safe grocery store to walk and shop in is far outweighed by the **burden** that may be imposed upon Walmart to keep its premises safe.

Seventh, the reason Walmart has **insurance** is to protect their business in these circumstances. Your company has a duty to pay when these risks occur.

Pursuant to the seven *Rowland v Christian* factors, Walmart had a clear duty to Bradley Borges to keep their premises safe, and make reasonable inspections to prevent danger to their customers.

In fact, the California Civil Jury Instructions (hereinafter "CACI") for Premises Liability cases unequivocally proclaim the rules and public policy elaborated above. CACI No.1000 states the following:

> **Bradley Borges claims that he was harmed because of the way Walmart managed thier property. To establish this claim, Bradley Borges must prove all of the following:**
>
> **1. That Walmart [owned/leased/occupied/controlled] the property;**
>
> **2. That Walmart was negligent in the use or maintenance of the property;**
>
> **3. That Bradley Borges was harmed; and**
>
> **4. That Walmart's negligence was a substantial factor in causing Bradley Borges's harm."**

California adopts these safety rules because there has been an increasing regard for human safety. Specifically, in stores customers are distracted by their goods and services. Stores market their goods creatively using colors, art, and other marketing techniques designed to capture the attention of customers. Customers are expected to be distracted by these innovating marketing techniques while shopping. Therefore, less attention, if any, is appropriated to their surroundings where unreasonable risk of danger may be present. The grocery store benefits from this distraction. Thus, the law imposes these safety rules on business owners because they are in control of the premises, create distractions to their benefit, and are in the better position to avoid and remedy unreasonable risk of harm. If business owners were not required to follow these safety rules, the public would have an increasing risk of danger every time they walk inside a grocery store,

electronic store, or any other place of business that creates distractions for business purposes, which inadvertently increase the risk of harm, as customers are expected to pay less attention to their surroundings to notice and avoid harmful conditions.

Your insured should have inspected its aisle of goods more frequently. Walmart should have known to do this in order to keep its premises safe for the public. Walmart should have known by having an employee negligent to their surroundings while operating heavy machinery in the goods aisle, presented a higher risk of danger. Walmart knew by its own business records that their aisle of goods usually has a high traffic of customers. Had your insured adhered to the safety rules of reasonable inspection and maintaining its premises safe for its customers then Bradley Borges would have not fallen and suffered severe bodily injuries.

But for your insured's gross negligence, this accident would have never occurred.

Our client suffered injuries to his **neck, back, and head**, **including multiple 1-2.5 mm cervical disc bulges, multiple 2mm thoracic disc bulges, and multiple 2-3mm lumbar disc protrusions.** Our client's injuries are severe and catastrophic, resulting in our client needing **lumbar decompression possible fusion vs cervical decompression possible fusion surgery worth $220,000**, to begin with. *See* attached medical records and MRI Reports.

On July 07, 2022, after being impacted by your insured's mechanical cart, Mr. Borges was immediately filled with pain and rushed to Long Beach Memorial Hospital to be evaluated. Upon arrival, he described feeling a whiplash-type injury rattling his brain, headache, neck pain, and back pain. Mr. Borges was rushed to radiology where he underwent imaging of his cervical spine, lumbar spine, and head. After reviewing his symptoms Mr. Borges was administered a Ketorolac 15mg injection and discharged. *See* Diagnosis Below:

**Neck:** normal range of motion, no tenderness, supple. No midline cervical TTP.[AT.1T] + B/L[AT.3M] cervical paraspinal TTP.
**Respiratory:** No respiratory distress, normal breath sounds.
**Cardiovascular:** Normal rate, normal rhythm, no murmurs, no gallops, no rubs
**GI:** Soft, nondistended, nontender, no organomegaly, no mass, no rebound, no guarding
**GU:** No costovertebral angle tenderness
**Musculoskeletal:**[AT.1T] + diffuse midline L spine and B/L paraspinal muscle TTP. + upper B/L thoracic paraspinal muscle TTP. No overlying signs of trauma, skin discoloration or swelling.[AT.3M]

**Impression:**[KW.1T]
Acute bilateral low back pain without sciatica
Neck pain
Acute nonintractable headache, unspecified headache type[KW.2T]

**ketorolac (TORADOL) injection 15 mg [395092665]**

| | |
|---|---|
| Ordering Provider: Tavarez, Ashley, PA-C | Status: Completed (Past End Date/Time) |
| Ordered On: 07/08/22 1457 | Starts/Ends: 07/08/22 1500 - 07/08/22 1513 |
| Ordered Dose (Remaining/Total): 15 mg (0/1) | Route: Intramuscular |
| Frequency: Once | Ordered Rate/Order Duration: — / — |

**Final Diagnoses (ICD-10-CM)**

| Code | Description |
|---|---|
| R51.9 [Principal] | Headache, unspecified |
| M54.2 | Cervicalgia |
| M54.50 | Low back pain, unspecified |

**External Causes of Injury (ICD-10-CM)**

| Code | Description |
|---|---|
| V98.8XXA | Other specified transport accidents, initial encounter |
| Y92.512 | Supermarket, store or market as the place of occurrence of the external cause |

Claim No. 10159112
March 26, 2024

Following this initial evaluation and treatment on August 08, 2022, Mr. Borges presented himself to Dr. Peter Ly MD. For an evaluation. While there he expressed excruciating pain generalized in the body. Upon examination, Dr. Peter Ly discovered a very limited range of motion in the cervical spine, a positive kemps test going bilaterally, tenderness upon palpation of the neck, severe tenderness between the shoulder blades, severe tenderness in the right side of the right rib, severe tenderness in the lumbar spine, and left shoulder pain. Dr. Peter Ly, MD completed his evaluation and determined that he would require additional imaging and conservative care. *See* Diagnosis below:

**ASSESSMENT:**

1. Status post trauma from being hit with a working vehicle.
2. Mild history of trauma with some history of back pain.
3. Neck pain, rule out cervical disc herniation.
4. Mid-thoracic pain, rule out compression fracture, also rule out rib fracture.
5. Lumbar spine pain, rule out exacerbation of the low back.

**RECOMMENDATIONS:**

1. Have the patient start physical therapy, chiropractic treatment.
2. MRI of the cervical spine, lumbar spine, and thoracic spine.

Then on August 17, 2022, Mr. Borges presented himself to Oracle Imaging. While there he underwent imaging of his brain, cervical spine, thoracic spine, and lumbar spine. It was unfortunately discovered he had suffered **multiple 1-2.5 mm cervical disc bulges, multiple 2mm thoracic disc bulges, and multiple 2-3mm lumbar disc protrusions.** *See* Imaging below:

***MRI OF THE BRAIN – 08/17/2022***

**IMPRESSION:**

1. No evidence for acute infarct.
2. **Bilateral subcortical and periventricular white matter changes, which are nonspecific, with broad differential considerations including demyelinating disease, inflammatory process, or chronic microvascular ischemia. There is a frontal lobe predominance where there is also suggestion of encephalomalacia. Posttraumatic gliosis is also a consideration in the appropriate clinical scenario.**
3. **Partial opacification of the ethmoid sinus suggestive of moderate sinusitis in this region.**
4. **Mild mucosal thickening of the frontal and maxillary sinus.**



***MRI OF THE CERVICAL SPINE – 08/17/2022***

IMPRESSION:
AT C3-C4, THERE IS LEFT-SIDED UNCOVERTEBRAL BONY HYPERTROPHY WITH ABUTMENT OF THE EXITING LEFT CERVICAL NERVE ROOT.

AT C5-C6, THERE IS A 2.5-MM MIDLINE DISC PROTRUSION RESULTING IN FLATTENING OF THE ANTERIOR THECAL SAC WITH A MILD DEGREE OF CENTRAL CANAL STENOSIS AS WELL AS BIFORAMINAL UNCOVERTEBRAL BONY HYPERTROPHY RESULTING IN ABUTMENT OF THE EXITING CERVICAL NERVE ROOTS BILATERALLY.

***MRI OF THE THORACIC SPINE – 08/17/2022***

IMPRESSION:
MILD EXAGGERATED KYPHOSIS OF THE THORACIC SPINE.

AT T5-T6, THERE IS A 2-MM MIDLINE AND RIGHT PARACENTRAL DISC PROTRUSION RESULTING IN FLATTENING OF THE ANTERIOR THECAL SAC WITH A MILD DEGREE OF CENTRAL CANAL STENOSIS.

AT T7-T8, THERE IS A 2-MM MIDLINE AND LEFT PARACENTRAL DISC PROTRUSION RESULTING IN FLATTENING OF THE ANTERIOR THECAL SAC WITH A MILD DEGREE OF CENTRAL CANAL STENOSIS.

THERE IS A QUESTIONABLE POSSIBLE NODULAR DENSITY IN THE RIGHT LUNG REGION OR THIS MAYBE ARTIFACTUAL. UNDERLYING PATHOLOGY IN THE REGION OF THE LUNGS WILL REQUIRE EXCLUSION. FURTHER EVALUATION WITH DEDICATED CT IMAGING OF THE CHEST IS RECOMMENDED.

***MRI OF THE LUMBAR SPINE – 08/17/2022***

IMPRESSION:
MULTILEVEL FACET ARTHROPATHY.

MINIMAL ANTEROLISTHESIS OF L4 ON L5

AT L5-S1, THERE IS A POSTERIOR ANNULAR TEAR WITH A 3-MM RIGHT FORAMINAL DISC PROTRUSION RESULTING IN ABUTMENT OF THE EXITING RIGHT L5 NERVE ROOT.

AT L4-L5, THERE IS A 2-MM CIRCUMFERENTIAL DISC BULGE WITH ABUTMENT OF THE EXITING RIGHT AND LEFT L4 NERVE ROOTS.

SEE BODY OF THE REPORT FOR ADDITIONAL FINDINGS.

ON THE EDGE OF THE IMAGES, THERE IS A T2 HYPERINTENSE MASS INVOLVING THE LEFT KIDNEY MEASURING APPROXIMATELY 1.6 CM WHICH MAY REPRESENT A RENAL CYST. FURTHER EVALUATION WITH DEDICATED ULTRASOUND IMAGING OF THE KIDNEYS IS RECOMMENDED.

On August 22, 2022, Mr. Borges returned to Dr. Peter Ly M.D. for reevaluation. While there he continued to report severe neck pain, back pain, and headaches. Mr Peter Ly M.D. reviewed his imaging to date and determined that Mr. Borges would require **cervical facet joint**

**injections, C2 to C6, worth $15,000.00**, and **lumbar facet joint injections at L3 to S1 worth $15,000.00,** to begin with. *See* Diagnosis below:

**ASSESSMENT:**

1. Status post injury from being hit by the vehicle in the supermarket.
2. Neck pain due to facet joint irritation from C2 to C6 with disc herniation from C2 to C6.
3. Thoracic spine disc herniations at T5-T6 to T7 with lung lesions on the right side with chronic wedging of the T8 vertebra.
4. Lumbar disc herniation, L2 to S1, with facet joint arthrosis causing severe back pain.
5. MRI of the thoracic spine shows he has disc disease including 3 mm at C5-C6 and 2 mm at C7-C8 with the lung lesions of the right lobe of the lung with chronic wedging at the T8.

**RECOMMENDATION:**

1. Start therapy through a chiropractic doctor and physical therapy.
2. Proceed with the cervical facet joint injections, C2 to C6, followed by lumbar facet joint injections at L3 to S1. Mr. Borges is also instructed to follow up with his primary care regarding the lesions on his right lung as well as the MRI and the kidney cyst. The patient has been explained the risks and benefits of the surgery, which include bleeding, infection, and nerve damage and Mr. Borges verbalizes understanding and wishes to proceed with the injections. The approximate cost for each procedure is $12,000 to $15,000.

Later that day Mr. Borges presented himself to Dr. James Villa to begin his chiropractic therapy.

CHIEF COMPLAINTS:

1. Constant moderate/severe lower back pain with radiculopathy.
2. Constant moderate upper back pain.
3. Constant moderate/severe neck pain that causes difficulty when sleeping.
4. Headaches lasting over 10 minutes.

On September 10, 2022, Mr. Borges presented himself to Unicare Surgery Center. While. there he underwent facet joint injections at the bilateral C2-C3, C3-C4, C4-C5, and C5-C6 to address the cervical disc herniations he suffered. *See* Operative Report below:

**POSTOPERATIVE DIAGNOSES:**

1. Status post motor vehicle accident.
2. Cervical disc herniation, C2 to C7, with facet joint arthrosis causing severe neck pain.

**PROCEDURES PERFORMED:**

1. Examination of cervical spine under fluoroscopy.
2. Facet joint injections, bilateral C2-C3, C3-C4, C4-C5, and C5-C6.
3. Needle placement under fluoroscopic guidance.

**DESCRIPTION OF PROCEDURE:** After risks and benefits were explained, the patient was brought to the OR and was placed in prone. The vital signs were monitored. Sedation was given. Skin was prepped under sterile fashion using ChloraPrep. The cervical facet joints were identified at C2 to C6. After the skin was infiltrated with 1% lidocaine, 22 gauge 5 inch spinal needles were introduced and advanced towards the facet joint using gun-barrel technique. After negative aspiration of all eight needles for any blood or CSF, arthrogram was done by injecting 0.5 cc of Omnipaque 200. Under fluoroscopy, contrast was confirmed to be spreading intra-articularly. A mixture containing 10 mg of Kenalog with 1 cc of 0.25% Marcaine was injected into each facet joint. The needles were removed. Band-Aids were applied.

Then on September 19, 2022, Mr. Borges returned to Dr. Peter Ly M.D. for re-evaluation. While there he continued to complain of back pain worsened with sitting and lying down. Dr. Peter

Ly M.D. reviewed his symptoms and responsiveness to his injection before determining that Mr. Borges would benefit from a cervical, lumbar, and thoracic spine facet joint injection. Mr Borges agreed to undergo a facet joint injection, bilateral L3 to S1. *See* Diagnosis below:

**DIAGNOSTIC STUDIES:**

Review of the MRI shows he has disc herniation from L3 to S1 with facet joint arthrosis.

**RECOMMENDATIONS:**

Return at the next visit for the facet joint injection, bilateral L3 to S1. Mr. Borges has been explained the risks and benefits, and he wishes to proceed with the injection.

On October 08, 2022, Mr. Borges returned to Unicare Surgery Center. While there he underwent facet joint injections to the bilateral L3-L4. L4-L5 and LS-S to address his lumbar disc herniations and annular tear. *See* Operative Report below:

**POSTOPERATIVE DIAGNOSES:**

1. Status post motor vehicle accident.
2. Lumbar disc herniation, L3-L4 2 mm, L4-L5 2 mm, and L5-S1 2 mm with annular tear.
3. Severe back pain due to facet joint arthrosis, bilateral L3-L4, L4-L5, and L5-S1.

**PROCEDURES PERFORMED:**

1. Examination of lumbar spine under fluoroscopy.
2. Facet joint injections, bilateral L3-L4, L4-L5, and L5-S1.
3. Needle placement under fluoroscopic guidance.

**DESCRIPTION OF PROCEDURE:** After risks and benefits were explained, the patient was brought to the OR and was placed in prone. The vital signs were monitored. Sedation was given. Skin was prepped under sterile fashion using ChloraPrep. The facet joints were identified. The narrowing of the facet joints was identified under fluoroscopy. After the skin was infiltrated with 1% lidocaine, 22 gauge 5 inch spinal needles were introduced and advanced towards the facet joint using gun-barrel technique. After negative aspiration of all six needles for any blood or CSF, arthrogram was done by injecting 0.5 cc of Omnipaque 200. Under fluoroscopy, contrast was confirmed to be spreading intra-articularly. A mixture containing 10 mg Kenalog with 1 cc of 0.25% Marcaine was injected into each facet joint. The needles were removed. Band-Aids were applied.

Then on November 23, 2022, Mr. Borges presented himself to TBI Specialists for a neurological consultation. While there he described intermittent throbbing headaches, dizziness, blurry vision, imbalance, loss of equilibrium, weakness, constant, throbbing neck pain associated with swelling, stiffness, soreness, and popping, weakness, numbness, and tingling sensation in his bilateral hand, constant throbbing pain in the lower back, increased irritability, difficulty concentrating and focusing, short and long-term memory impairment, difficulty falling and staying asleep, difficulty with remembering words, and is prone to outbursts of anger due to pain. After a thorough review of his symptoms, Dr. Jonathan Eskenazi MD performed **a bilateral greater and lesser occipital nerve block, bilateral cervical trigger point injections, EMG/ NCV, VAT combo with ENG and vestibular exercises.** *See* Diagnosis Below:

Claim No. 10159112
March 26, 2024

Cardiovascular System: The patient reports chest pain and hypertension.

ENT: The patient reports blurred vision and tinnitus.

Respiratory System: The patient reports shortness of breath.

DIAGNOSIS:
1. Neuralgia, bilateral greater and lesser occipital nerve block
2. Chronic pain, Bilateral

PROCEDURE(S):
1. Nerve block, bilateral greater and lesser occipital nerve block

ATTENDING SURGEON: Jonathan Joseph Eskenazi, MD

Procedure Details:
The risks, benefits, complications, treatment options, and expected outcomes were discussed with the patient. The possibilities of reaction to medication, pulmonary aspiration, bleeding, infection, the need for additional procedures, failure to diagnose a condition, and creating a complication requiring transfusion or operation were discussed with the patient.

The area of the trigger point was identified and the skin prepped three times with alcohol and the alcohol allowed to dry. Next, a 25-gauge needle was placed in the area of the trigger point. Once reproduction of the pain was elicited and negative aspiration confirmed, the trigger point was injected and the needle removed.

Medication: 0.5% Marcaine (bupivicaine)

Trigger points injected: 6
Muscle groups: 3 (cervical paraspinal, trapezius and splenious), bilateral

**ENGplus Test Results:**

| | |
|---|---|
| Smooth Pursuit: | Abnormal |
| Gaze: | WNL |
| Optokinetic: | WNL |
| Positional: | WNL |
| Positioning(Dix Hallpike): | |

The Vestibular Autorotation Test (VAT®) is a clinical test of the high-frequency horizontal and vertical vestibulo-ocular reflex (VOR).

| | |
|---|---|
| Horizontal VAT: | Abnormal |
| Vertical VAT: | WNL |

Data Interpretation

The gaze test appears to be normal in all positions with eyes open and closed. The optokinetic responses appeared to be symmetrical. The smooth pursuit test appears to be abnormal and may be consistent with CNS involvement. The abnormal saccades may not be clinically significant. Tests can be affected by the testing environment, age, and compliance of the patient. The positional test appears to be within normal limits. Horizontal VAT is abnormal. Vertical VAT is within normal limits.

**RECOMMENDATIONS:**

1. Greater and lesser occipital nerve block and Trigger point injections today in office
2. Pain management consult for upper and lower back pain
3. Advance MRI technique including 3 Tesla MRI of the brain without contrast with SWI and DTI and volumetric analysis
4. EEG routine today in office
5. EMG NCS r/o radiculopathy today in office
6. VAT combo with ENG and vestibular exercises today in office
7. Neurological follow-up in 2-3 months

**IMPRESSION:**

1. POSTCONCUSSIVE SYNDROME
2. RULE OUT TRAUMATIC DISEQUILIBRIUM SYNDROME
3. POSTCONCUSSIVE HEADACHE
4. POST TRAUMATIC NECK STRAIN WITH RADIATION R/O RADICULOPATHY

Claim No. 10159112
March 26, 2024

Soon after on December 08, 2022, Mr. Borges presented himself to Shin Imaging Center. While there he underwent an MRI of his brain. *See* Imaging below :

***MRI OF THE BRAIN – 12/08/2022***

IMPRESSION:

| FINDINGS: WHITE MATTER STRUCTURE | MEAN FA VALUE (normative percentile) |
|---|---|
| Whole brain: | 0.37 (53rd percentile) |
| Corpus callosum: | 0.60 (26th percentile) |
| Left corticospinal tract: | 0.44 (80th percentile) |
| Right corticospinal tract: | 0.43 (77th percentile) |
| Left superior longitudinal/arcuate complex: | 0.32 (72nd percentile) |
| Right superior longitudinal/arcuate complex: | 0.31 (52nd percentile) |
| Left inferior fronto-occipital tract: | 0.29 (53rd percentile) |
| Right inferior fronto-occipital tract: | 0.26 (29th percentile) |
| Left cingulum: | 0.30 (36th percentile) |
| Right cingulum: | 0.31 (61st percentile) |

Then on January 11, 2023, Mr. Borges returned to TBI Specialist for reevlaution. While there he complained of constant throbbing, pounding headaches all over the head associated with blurred vision, pain in both eyes, pain in both ears, sensitivity to light, and tenderness, pain on the scalp all over the head when brushing/combing his hair, dizziness, imbalance, constant, throbbing, sore neck pain that radiates to the upper back into the shoulder blade, constant, throbbing, pressure-like, tension-like, sore back pain, bilateral hip pain, bilateral knee pain, difficulty in concentrating and focusing, and sleep disturbances. After reviewing his imaging Dr. Jonathan Eskenazi MD determined that Mr. Borges would undergo a **greater and lesser occipital nerve block, trigger point injection,** and VAT combo with ENG. *See* Diagnosis Below:

IMPRESSION:

1. POSTCONCUSSIVE SYNDROME
2. TRAUMATIC DISEQUILIBRIUM SYNDROME
3. POSTCONCUSSIVE HEADACHE
4. POST TRAUMATIC NECK STRAIN WITH RADIATION R/O RADICULOPATHY

PROCEDURE(S):
1. Nerve block, bilateral greater and lesser occipital nerve block

ATTENDING SURGEON: Jonathan Joseph Eskenazi, MD

INDICATIONS: The patient has chronic pain in bilateral occipital notch.
The risks, benefits, complications, treatment options, and expected outcomes were discussed with the patient. The possibilities of reaction to medication, pulmonary aspiration, bleeding, infection, the need for additional procedures, failure to diagnose a condition, and creating a complication requiring transfusion or operation were discussed with the patient.
The patient agrees to undergo diagnostic and possibly therapeutic nerve block, accepting the risks of bruising, temporary pain, hematoma and no improvement.

PROCEDURE DETAILS: The area of planned injection was marked. Time out procedure confirmed the patient's name, planned procedure and the site was verified. No antibiotic is indicated. The patient's skin was prepped with alcohol swab.

Medication: 0.5% Marcaine (bupivicaine)

1 ml injected at the foramen of L greater occipital nerve and 1 ml at the L Lesser Occipital nerve area using a 30ga needle.
1 ml injected at the foramen of R greater occipital nerve and 1 ml at the R Lesser Occipital nerve area using a 30ga needle.

Total volume injected 4 ml

Indications: neck pain

Procedure Details:
The risks, benefits, complications, treatment options, and expected outcomes were discussed with the patient. The possibilities of reaction to medication, pulmonary aspiration, bleeding, infection, the need for additional procedures, failure to diagnose a condition, and creating a complication requiring transfusion or operation were discussed with the patient.

The area of the trigger point was identified and the skin prepped three times with alcohol and the alcohol allowed to dry. Next, a 25-gauge needle was placed in the area of the trigger point. Once reproduction of the pain was elicited and negative aspiration confirmed, the trigger point was injected and the needle removed.

Medication: 0.5% Marcaine (bupivicaine)

Trigger points injected: 6
Muscle groups: 3 (cervical paraspinal, trapezius and splenious), bilateral

On March 20, 2023, Mr. Borges returned for a second follow-up evaluation with Dr. Peter Ly, MD. While there he reported ongoing neck pain with tingling in both hands. and back pain. Dr. Peter Ly MD reviewed his symptoms and determined that he would recommend a radiofrequency ablation of the **medial branch nerve innervating the facet joint L4-L5 and L5-**

**S1** worth **$15,000.00** and **PRP injections for cervical facet joint injections from C2 to C6** worth **$15,000.00**, to begin with. *See* Diagnosis below:

**RECOMMENDATIONS:**

1. My recommendation is to proceed with a radiofrequency ablation of the medial branch nerve innervating the facet joint L4-L5 and L5-S1 for his back pain since he got relief temporarily with the injections.
2. Regarding the neck issue, I also recommended PRP injections for cervical facet joint injections from C2 to C6. Mr. Borges has agreed to the above recommendations and about the carpal tunnel syndrome, I recommended to see the orthopedic doctor for decompressions. At this point, we will do the ablation of the medial branch nerve in the lumbar spine first, followed by cervical facet joint injection, C2 to C6 with platelet rich plasma. The approximate cost for each procedure is $12,000 to $15,000.
3. Orthopedic referral for the carpal tunnel syndrome.

Then on April 17, 2023, Mr. Borges presented himself to Unocare Surgery Center. While there he underwent a facet joint injection to the left C2-C3, C3-C4, C4-C5, and C5-C6, with platelet-rich plasma to address cervical disc herniation, C6-C7 with disc desiccation, and facet joint inflammation. *See* Operative Report below:

**POSTOPERATIVE DIAGNOSES:**

1. Cervical disc herniation, C6-C7 with disc desiccation.
2. Neck pain due to facet joint inflammation, left C2-C3, C3-C4, C4-C5, C5-C6 and C6-C7.

**DESCRIPTION OF PROCEDURE:** The patient has been explained the risks and benefits. The patient's blood was obtained through the IV line approximately 30 mL, after centrifuging his blood approximately 5 mL of the PRP was raised. The patient was brought to the OR and was placed in prone. The vital signs were monitored. Sedation was given. Skin was prepped under sterile fashion using ChloraPrep. The patient's head was turned to the right side. The cervical facet joint was identified. Narrowing of the cervical C2-C3, C4-C5, C5-C6 and C6-C7 were identified. Skin above these five joint was infiltrated with 1% lidocaine. Then, 22-gauge spinal 5 inch needles were introduced and advanced towards the each facet joint using gun-barrel technique. After negative aspiration of all five needles for any blood, arthrogram was done by injecting 0.25 cc of Omnipaque 200. Under fluoroscopy, contrast was confirmed to be spreading intra-articularly. A 1 mL of the PRP was injected into each facet joint. All five needles were removed. Band-Aids were applied.

On May 15, 2023, Mr. Borges returned to Unicare Surgery Center. While there he underwent **a radiofrequency ablation of medial branch nerve innervating the facet joints at the bilateral, L4-L5, and L5-S1** to address his lumbar disc herniations. *See* Operative Report below:

**DESCRIPTION OF PROCEDURE:** After risks and benefits were explained, the patient was brought to the OR and was placed in prone. The vital signs were monitored. Sedation was given. Skin was prepped under sterile fashion using ChloraPrep. The pedicle of the L4, L5, and the sacral ala on each side was identified under fluoroscopy. Skin above these sites was infiltrated with 1% lidocaine. Then, 18-gauge 15 mm RF needles were introduced and advanced towards each site. Motor testing was carried out at 2 Hz. Voltage was gradually increased to 2 mA. There was no recruitment of any peripheral nerve in the lower extremity. Ablation was carried out at 80$^{0}$ C for 90 seconds. The needles were removed. However, prior to removing the needle, a mixture containing 5 mg of Kenalog with 1 cc of 0.25% Marcaine deposited over the lesioning site to prevent any neuritis. The same technique was used to ablate the left facet joint. Band-Aids were applied.

Claim No. 10159112
March 26, 2024

A couple of days later on May 13, 2023, Mr. Borges returned to TBI Specialist for a follow up evaluation. While there he reported worsening intermittent throbbing headaches associated with dizziness, blurred vision, nausea and imbalance, bilateral tinnitus, constant throbbing, sore neck pain that radiates into the skull, constant throbbing back pain that radiates into the hips, memory issues, difficulty focusing, and feelings of depression, anxiety, stress and frustration. Dr. Jonathan Eskenazi MD determined that Mr. Borges would undergo a **cervical trigger point injection**, **bilateral greater and lesser occipital nerve block**, and **a VAT combo with ENG.** *See* Diagnosis Below:

**Trigger Point Injection Procedure Note**

RE: Borges, Bradley
Date: 5-15-23

Indications: neck pain

Procedure Details:
The risks, benefits, complications, treatment options, and expected outcomes were discussed with the patient. The possibilities of reaction to medication, pulmonary aspiration, bleeding, infection, the need for additional procedures, failure to diagnose a condition, and creating a complication requiring transfusion or operation were discussed with the patient.

The area of the trigger point was identified and the skin prepped three times with alcohol and the alcohol allowed to dry. Next, a 25-gauge needle was placed in the area of the trigger point. Once reproduction of the pain was elicited and negative aspiration confirmed, the trigger point was injected and the needle removed.

**Procedure Note - Occipital Nerve Block**

PROCEDURE DETAILS: The area of planned injection was marked. Time out procedure confirmed the patient's name, planned procedure and the site was verified. No antibiotic is indicated. The patient's skin was prepped with alcohol swab.

Medication: 0.5% Marcaine (bupivicaine)

1 ml injected at the foramen of L greater occipital nerve and 1 ml at the L Lesser Occipital nerve area using a 30ga needle.
1 ml injected at the foramen of R greater occipital nerve and 1 ml at the R Lesser Occipital nerve area using a 30ga needle.

Total volume injected 4 ml

**ENGplus Test Results:**

| | |
|---|---|
| Smooth Pursuit: | Abnormal |
| Gaze: | WNL |
| Optokinetic: | WNL |
| Positional: | WNL |
| Positioning(Dix Hallpike): | |

The Vestibular Autorotation Test (VAT®) is a clinical test of the high-frequency horizontal and vertical vestibulo-ocular reflex (VOR).

| | |
|---|---|
| Horizontal VAT: | WNL |
| Vertical VAT: | Abnormal |

Data Interpretation

The gaze test appears to be normal in all positions with eyes open and closed. The optokinetic responses appeared to be symmetrical. The smooth pursuit test appears to be abnormal and may be consistent with CNS involvement. The abnormal saccades may not be clinically significant. Tests can be affected by the testing environment, age, and compliance of the patient. The positional test appears to be within normal limits. Horizontal VAT is within normal limits. Vertical VAT is abnormal.

Recommendation & Comments

This data pattern is typically seen in patients with peripheral vestibular pathology. In our experience, these patients usually respond well to vestibular exercises.

**IMPRESSION:**

1. TRAUMATIC BRAIN INJURY WITH PERSISTENT POSTCONCUSSIVE SYNDROME
2. TRAUMATIC DISEQUILIBRIUM SYNDROME
3. POSTCONCUSSIVE HEADACHE
4. POST TRAUMATIC NECK STRAIN WITH RADIATION R/O RADICULOPATHY

On June 10, 2023, Mr. Borges returned to Unicare Surgery Center. While there he underwent a **Radiofrequency Ablation of the Medial Branch Nerve Innervating The Facet Joint, Right C3-C4, C4-C5, C5-C6, and C6-C7** to try and alleviate his cervical disc herniations. *See* Operative Report below:

**DESCRIPTION OF PROCEDURE:** Risks and benefits were explained. The patient was brought to the OR and was placed in prone. The vital signs were monitored. Sedation was given. Skin was prepped under sterile fashion using ChloraPrep. The vertebral body of the C3, C4, C5, C6 and C7 of the vertebrae, the cervical spine was identified. Skin above these four joints was infiltrated with 1% lidocaine. Then, 18-gauge 10 cm RF needles were introduced towards these areas. Lateral view of the C-arm was used to identify the needle-tip was not too far advanced. Motor testing was carried out at 2 Hz. Voltage was increased to 2mA. There was no recruitment of any nerve in the extremity. Ablation was carried out at 80°C for 90 seconds. The needles were inverted onto the facet joints at C3-C4, C4-C5 and C6-C7. Again, motor testing was carried out. There was no recruitment of any nerve in the extremity. The second ablation was carried out again at 80°C for 90 seconds. Prior to removing the needles, a mixture containing 10 mg of Kenalog with a 1 cc of 0.25% Marcaine was deposited over the lesioning site. Band-Aids were applied.

On July 08, 2023, Mr. Borges returned to Unicare Surgery Center. While there he underwent yet another **Radiofrequency Ablation of Medial Branch Nerve Innervating Left C3-C4, C4-C5, C5-C6, and C6-C7.** *See* Operative report below:

**DESCRIPTION OF PROCEDURE:** After risks and benefits were explained, the patient was brought to the OR and placed in prone. The vital signs were monitored. Sedation was given. Skin was prepped under sterile fashion using ChloraPrep. The Fluoroscan was utilized to identify the vertebrae intra-articular C3-C4, C4-C5, C5-C6, and C6-C7. Skin above these sites was infiltrated with 1% lidocaine. Then, 18-gauge 15 cm RF needle was introduced and advanced towards these sites. Lateral view of the C-arm was utilized to confirm that the needle was in the correct place. Motor testing was carried out at 2 Hz. Voltage was gradually increased to 2 Amp. There was no recruitment of any peripheral nerve in the upper extremity. Ablation was carried out at 80°C for 90 seconds. The needle was then inverted 180 degrees and the same ablation was carried out for the second cycle. Prior to removing the needle, a mixture containing 8 mg of Kenalog with 1 cc of 0.25 Marcaine was deposited over the lesion sites to prevent neuritis.

Additionally, on July 22, 2023, Mr. Borges returned to Unicare Surgery Center for another procedure. While there he underwent **a Bilateral SI joint injection with cortisone** to address his severe back pain. *See* Operative Report below:

Claim No. 10159112
March 26, 2024

**DESCRIPTION OF PROCEDURE:** The patient was brought to the OR and placed in prone. The vital signs were monitored. Sedation was given. Skin was prepped under sterile fashion using ChloraPrep. The SI joints were identified. Skin at the inferior border of the SI joint infiltrated with 1% lidocaine. Then, 22-gauge spinal needles were introduced and advanced towards the SI joints using gun-barrel technique. After negative aspiration of both needles for any blood or CSF, arthrogram was done by injecting 0.5 cc of Omnipaque 200. Under fluoroscopy, contrast was confirmed to be spreading intra-articularly. A mixture containing of 20 mg of Kenalog with 1.5 cc of 0.25% Marcaine was injected into each SI joint. Both needles were removed. Band-Aids were applied.

Later that month on July 31, 2023, Mr. Borges returned to TBI Specialist for an evaluation. While there he underwent an additional cervical trigger point injection and a bilateral greater and lesser occipital nerve block. *See* Operative Reports below:

Procedure Details:
The risks, benefits, complications, treatment options, and expected outcomes were discussed with the patient. The possibilities of reaction to medication, pulmonary aspiration, bleeding, infection, the need for additional procedures, failure to diagnose a condition, and creating a complication requiring transfusion or operation were discussed with the patient.

The area of the trigger point was identified and the skin prepped three times with alcohol and the alcohol allowed to dry. Next, a 25-gauge needle was placed in the area of the trigger point. Once reproduction of the pain was elicited and negative aspiration confirmed, the trigger point was injected and the needle removed.

PROCEDURE DETAILS: The area of planned injection was marked. Time out procedure confirmed the patient's name, planned procedure and the site was verified. No antibiotic is indicated. The patient's skin was prepped with alcohol swab.

Medication: 0.5% Marcaine (bupivicaine)

1 ml injected at the foramen of L greater occipital nerve and 1 ml at the L Lesser Occipital nerve area using a 30ga needle.
1 ml injected at the foramen of R greater occipital nerve and 1 ml at the R Lesser Occipital nerve area using a 30ga needle.

Total volume injected 4 ml

**IMPRESSION:**

1. TRAUMATIC BRAIN INJURY WITH PERSISTENT POSTCONCUSSIVE SYNDROME
2. TRAUMATIC DISEQUILIBRIUM SYNDROME
3. POSTCONCUSSIVE HEADACHE
4. POST TRAUMATIC NECK STRAIN WITH RADIATION R/O RADICULOPATHY

I have reviewed the MRI scan of the brain without contrast done on December 8, 2022, showing bifrontal focal encephalomalacia, right greater than left frontal lobes with associated T2 FLAIR hyperintense signal compatible with gliosis from trauma,

Then on August 14, 2023, Mr. Borges returned to Dr. Peter Ly for reevaluation. While there he walked with a slight stooped forward fashion and expressed pain all over his entire body and

ongoing tingling and tenderness to the leg. Dr. Peter Ly reviewed his imaging and referred Mr. Borges to be evaluated by a spine orthopedic surgeon. *See* Diagnosis below:

> **ASSESSMENT:**
>
> Status post SI joint injection, sacroiliitis causing low back has improved; however, the leg symptoms are more than noticeable, including the tingling and shooting to the legs.
>
> **DIAGNOSTIC STUDIES:**
>
> Review of his MRI of the lumbar spine reveals he has disc herniation at multiple levels from L3 to S1.
>
> **RECOMMENDATIONS:**
>
> I recommend Mr. Borges to be evaluated by the spine orthopedic surgeons to prefer recommendation for the treatment of the radicular symptoms to the leg.

On August 28, 2023, Mr. Borges completed his chiropractic therapy with Villa Chiropractic. While there he completed 48 sessions of chiropractic therapy before reaching maximum medical improvement. *See* Diagnosis below:

> Upon follow, the patient was still symptomatic, however, he was much improved. Range of motion studies in his neck and back revealed residual limitation in ranges of motion. He did demonstrate improvement; however, residual discomfort was mentioned. Palpatory findings revealed tenderness in the upper trapezius and lumbar muscles. He did undergo joint injections under the care of Peter Ly, M.D., and a pain management specialist.
>
> The patient reported feeling well enough to be released. Mr. Borges was released with the maximum benefit from our care. He was advised to perform home exercise, which includes range of motion. The patient was advised to return to this office should he experience exacerbations or remissions of his symptoms.
>
> **CAUSATION:**
>
> I have attempted to address the issues which may have arisen in this case. Based upon my opinion, the patient's complaints are direct result of the accident on July 07, 2022.
>
> **FUTURE MEDICAL CARE:**
>
> Future medical care should include prescribed and/or over-the-counter medication, and short courses of chiropractic physiotherapy for exacerbation of symptomatology. Pain management is indicated as warranted.

Lastly, on August 31, 2023, Mr. Borges presented himself to Dr. Azadeh Farin MD FACS FAANS for a neurosurgical evaluation. While there he communicated headaches, neck pain, shoulder pain, low back pain, hip pain, foot pain, calf pain, insomnia, numbness in his arms and hands, numbness in his bilateral lower extremities, jaw pain, worsening tinnitus, reading problems, emotional irritability, speech dysfunction, loss of libido, vertigo, dizziness, difficulty concentrating, sensitivity to light, irritability, loss of taste, loss of balance, sensitivity to sound, vision changes, anxiety and depression. Dr. Azadeh Farin MD FAANS FACS reviewed his entire

course of treatment to date and determined that Mr. Borges had failed conservative treatment and would benefit from **lumbar decompression possible fusion** and **cervical decompression possible fusion worth $220,000.00,** to begin with. *See* Diagnosis below:

**DIAGNOSTIC IMPRESSION:**

1. Status post blunt trauma
2. Probable mild TBI
3. Cervical spine pain, intractable, with lack of improvement from conservative measures, medical therapy and poorly responsive to chiropractic interventions and activity modifications; MRI C spine reveals mild cervical stenosis
3. Lumbar spine pain, intractable, with lack of improvement from conservative measures, medical therapy and poorly responsive to chiropractic interventions and activity modifications; MRI L spine reveals L4/5 spondylolisthesis, foraminal stenosis, facet arthropathy, annular tear, disc protrusion

**DISCUSSION AND RECOMMENDATIONS:**

I reviewed the clinical findings with the patient in detail. I spent at least 30 minutes time face-to face and in review of the records for the neurosurgical evaluation and decision-making process. Based on the history, physical examination and review of the available records, I am of the opinion that the subject accident is responsible for his symptoms.

I discussed several options with the patient in detail including continuation of medical therapy and chiropractic treatments, starting physical therapy, starting aqua therapy, and interventional pain injections necessary.

The patient has had very limited benefit from chiropractic therapy and has demonstrated an ineffective response to oral analgesics. At this point I recommend PT and then revisit to determine if he has had improvement to his satisfaction in controlling his symptoms. Should he fail conservative measures, he is a candidate for surgical intervention. This would include lumbar decompression possible fusion and/or cervical decompression possible fusion. Costs for either of these procedures will range between $180,000 to $220,000 including facility fees, anesthesia, preops, and implants if any as well as postoperative care. Should his post concussive symptoms persist he should proceed with MRI brain TBI protocol. We will reevaluate him in a few weeks to determine if he wishes to proceed with surgical intervention or simply proceed further with conservative measures.

As you know, to recover damages for prospective medical expenses, plaintiff must show: (1) The reasonable value of each of the expected future medical charges; (2) That the future medical care, services or supplies are reasonably certain to be needed and given in treatment of the injury; and (3) That the condition requiring the future medical care is causally connected to the injuries inflicted by defendant. [<u>CC § 3283</u>; <u>CACI 3903A</u>; <u>BAJI 14.10</u>; <u>Hoffman v. Southern Pac. Co</u>. (1929) 101 CA 218, 229-230, 281 P 681, 686; see <u>Garcia v. Duro Dyne Corp</u>. (2007) 156 CA4th 92, 97-99, 67 CR3d 100, 103-105].

As such, Bradley Borges makes a clear and unequivocal offer to settle his claim for the policy limits available to your insured regarding the accident of 12/09/2022, including the satisfaction of all liens, with the following conditions:

1. **Walmart Claims and all excess insurers must tender and pay all applicable policy limits; and**

2. **Acceptance of this offer provides complete, full, and final unconditional release to Walmart Claims's insured(s) from any and all present and future liability arising out of the occurrence giving rise to this personal injury, bodily injury, or wrongful death claim, including the satisfaction of all liens; and**

3. **This offer to settle must be accepted in writing and acceptance must be received by our law firm at the address set forth on our letterhead within thirty (30) days from the date of this letter; and**

4. **Time is of the essence; and**

5. **Acceptance must be received by or before the due date. No unreasonable extensions will be granted; and**

6. **Any communication that is not an unequivocal acceptance or a reason for an extension as explained in paragraph 5 will be deemed as a rejection; and**

7. **Walmart Claims must convey with their acceptance a complete declaration, notarized and under penalty of perjury, signed by their insureds, must be received by us that includes an attestation that their insureds were or were not in the scope of their employment or agency at the time and place of the accident, and were or were not engaged in a joint venture with any other person or entity at said time and place, and further that they have no other insurance policy that will defend or indemnify them for this bodily injury claim, including any umbrella or excess insurance coverages; and**

8. **Walmart Claims must convey with their acceptance a certified copy of the declaration page of any and all applicable insurance policies; and**

9. **Walmart Claims agrees that our office receive a payment of the settlement check within 21 days from the date of acceptance, or if you require the execution of a release, within 21 days of receipt of the duly executed Release of Bodily Injury Claims; and**

10. **Strict adherence to all of the terms and conditions of this offer is required for its acceptance and the creation of a binding settlement agreement.**

"A settlement demand is reasonable if (insurer) knew or should have known at the time the settlement demand was rejected that the potential judgment was *likely to exceed the amount of the settlement demand* based on (claimant's) injuries or loss and (insured's) probable liability." [CACI 2334 (emphasis and parentheses added)].

In Crisci v. Security Ins. Co. of New Haven, Conn. (1967) 66 C2d 425, 58 CR 13, the Supreme Court stated that "when there is great risk of a recovery beyond the policy limits … a consideration in good faith of the insured's interest requires the insurer to settle the claim … In determining whether an insurer has given consideration to the interests of the insured, *the test is whether a prudent insurer without policy limits would have accepted the settlement offer*." [Crisci v. Security Ins. Co. of New Haven, Conn., *supra*, 66 C2d at 429, 58 CR at 16 (emphasis added; internal quotes omitted)].

**PLEASE BE ADVISED THAT IN THE EVENT YOU REFUSE TO OFFER OUR CLIENT YOUR INSURED'S FULL POLICY LIMIT FOR CONSIDERATION, AND OUR CLIENT IS FORCED TO LITIGATE, DUE TO THE INCREASED FEES ASSOCIATED WITH LITIGATION, AS WELL AS THE ENORMOUS COSTS INVOLVED, OUR CLIENT HAS INSTRUCTED THIS OFFICE NOT TO ACCEPT YOUR INSURED'S POLICY LIMITS AT THAT TIME AND WILL PURSUE YOUR INSURED FOR A VERDICT IN EXCESS OF THEIR POLICY LIMITS. THEREFORE, OUR ABOVE OFFER TO CONSIDER SETTLEMENT IS VALID FOR THE PURPOSE OF THIS SETTLEMENT DEMAND ONLY.**

If you refuse to accept this offer or willfully or inadvertently permit this demand to expire, the policy as a matter of law will be construed to satisfy the full extent of any judgment obtained in a court of law. When an insurer unreasonably refuses to pay the policy limits when it is prudent to do so, the insurer in essence writes a new policy without limits. (Hulett v. Farmers Ins., Exchange (1992) 10 Cal.App.4th 1051, 1060). Consequently, our client will make a new and significantly higher demand in accord with the full value of our client's damages and/or extent of all remedies our client may be entitled to.

As I am sure you know, the duty to communicate settlement offers is particularly important when there is a conflict of interest between the insurer and insured, and that such conflict exists when, as here, the plaintiff is willing to settle this matter within policy limits. (Anguiano v. Allstate Ins. Co. (9th Cir. 2000) 209 F.3d 1167).

The duty to communicate settlement offers to the insured, does not end with a rudimentary notice. You must actually present this demand to your insured. Your insured must receive a tangible copy. Moreover, you are required to assist your insured with compliance of all terms herein. The failure to assist the insured in providing an asset disclosure, for example, may be evidence of bad faith. (Madrigal v. Allstate Ins. Co. (2016) 215 F.Supp.3d 870, 911).

Undoubtedly, your insured has paid multiple monthly premiums. These premiums are paid with the expectations of your insured, that in case your insured has an incident, your insured's interests are sufficiently protected. Your insured's interests include paying a demand, within policy limits, as this one. Our client never asked for these injuries, nor contributed to them as well. Your insured's negligent conduct imposed this predicament on our client.

While this correspondence is subject to Evidence Code §1152, nothing contained herein shall be construed to limit or impair, in any way, any of our client's claims, rights, remedies or defenses in this matter, all of which are hereby expressly reserved. In the spirit of cooperation and in further attempts to resolve these issues informally and amicably, if you are to have any further questions, please feel free to contact the undersigned upon receipt of this letter so that we may discuss the foregoing.

Thank you for your anticipated courtesy and cooperation in this regard.

Very truly yours,

**MAKKABI LAW GROUP, APC**

David F. Makkabi
Attorney at Law

DFM/ve